## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL ACTION** |
| **v.** | : | |
| | : | |
| | : | **NO.  25-183-GAW-1** |
| **DADISI WILLIAMS (1)** | : | |
| | : | |

## OPINION

### I.    Introduction

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. For the first two centuries of this Nation's history, a familiar set of rules and tests developed governing under what circumstances law enforcement officers can seize the property of civilians without a warrant. Those rules and tests were constructed in a time when the information one could possess in public was limited to that which they could physically hold on their person. For many years, those tests proved workable.

But in the era of smartphones, the United States Supreme Court has—at least twice—recognized that these rules no longer provide adequate protection to the privacy of the citizenry when applied to a modern smartphone. This is because the sheer quantity of data that one carries around in their pockets dwarfs the amount that was even conceivable when cases like *Terry v. Ohio* and *Chimel v. California*

were decided. Instead of a wallet with a few photos of one's children, one is now carrying around every photograph they have ever taken or been sent, including, in many cases, extraordinarily private photographs.[1] Instead of one's last few months of bank statements, one now has a banking app on their phone which can be used to show transactions going back years. Instead of the paperwork from one doctor's appointment, one is now carrying their entire medical history, and possibly up-to-the-minute statistics on things like sleep cycles and cardiovascular health. Instead of MapQuest directions between two locations, one is now carrying a detailed history of everywhere they have been for an extended period of time. Instead of an address book with the phone numbers and addresses of contacts, one is now carrying the entirety of all the written communications one has ever had with those contacts.

In response to this massive increase in the capacity to carry information, the Supreme Court decided in *Riley v. California* and *Carpenter v. United States* to significantly curb the government's ability to warrantlessly seize information stored on or created by smartphones, even when their historical analogs, such as billfolds and wallets, could have been searched incident to arrest. The old rules worked fine for those older privacy interests. But the advancement and ubiquity of smartphones created a need for new and more protective tests to apply to these 21st century devices.

---

[1]      *See, e.g.*, Kristina Rex, *How could Trooper Michael Proctor's damaging texts about Karen Read impact her trial outcome?*, CBS News (June 11, 2024), https://www.cbsnews.com/boston/news/karen-read-trial-michael-proctor-testimony-text-messages-impact/          [https://perma.cc/6HH4-7Q2S] (discussing a murder trial in Massachusetts where a trooper made comments suggesting he was looking for nude photographs while searching the phone of a female suspect).

This rebalancing makes good sense in the context of the severity of the deprivation of the property right in one's smartphone. Bank statements can be reprinted, and photographs are not necessary for one's functioning in everyday life. But a smartphone is ubiquitous to a number of everyday activities; the deprivation of access to one's phone can meaningfully hinder one's ability to live their life. Smartphones are some people's car keys and house keys. They are how many Americans pay their utility bill or their rent. They provide access to virtual credit cards, up to the minute health tracking and messages from one's doctor. They serve as multi-factor authentication tools for a host of services and job functions. For most Americans, a cell phone is the only means by which they can seek help in the face of a medical emergency.[2]

The question before this Court today is whether a police officer who conducts a *Terry* stop can seize the smartphone of a suspect without a warrant and hold it for four days before obtaining a warrant,[3] where the suggested exigency of destruction of evidence is not supported by any particularized evidence as to the defendant from whom the property was seized. This Court is also called upon to answer whether the Government may obtain a warrant to search a cell phone based only on generalized allegations that criminals tend to carry their phones with them and have evidence on

---

[2]    *See* Stephen J. Blumberg and Julian v. Luke, *Wireless Substitution: Early Release of Estimates from the National Health Interview Survey, July-December 2024*, Nat'l Inst. For Health Stat. (June 2025), https://www.cdc.gov/nchs/data/nhis/earlyrelease/wireless202506.pdf [https://perma.cc/3JLX-HCJX] ("78.7% of adults and 86.9% of children live[] in wireless-only households.").

[3]    The phone in question was seized on November 22, 2024, and the officer sought a warrant to search it on November 25, 2024. The warrant was issued on November 26, 2024.

3

them, and whether the Government's warrant for a cell phone can permit the search of all data created, without regard to the time the data was created or the likelihood of particular type of data to include evidence. This Court's answer too all of these questions is an emphatic "no." The evidence obtained from the phone pursuant to the November 26, 2024 warrant is suppressed, as is any fruit of the poisonous tree.

## II.  <u>Factual Background</u>

The Philadelphia and Lower Merion Police Departments became aware of a string of robberies and attempted robberies at a series of Family Dollar and AutoZone locations, all within close proximity to each other. Detective Gregory Jara of the Philadelphia Police Department and Detective James Black of the Lower Merion Police Department led the investigations into these robberies. Both detectives testified at the suppression hearing in this case.

Discussions with witnesses to the robberies led police to conclude that the incidents were likely connected. Each robbery was committed by two male individuals, who wore gloves and masks, displayed at least one (and often two) handguns, locked the doors, and seemed to have a police scanner. During the suppression hearing, each officer called by the Government testified that, prior to the seizure of Defendant Williams's phone, there was no evidence from witnesses or video footage that cell phones were used during the crimes or were even on the person of the offenders during the offenses. The officers similarly testified that they had no evidence prior to the seizure and search of Mr. Williams's phone that the suspects used cell phones to communicate before or after the robberies, or used them to brag

about their crimes on social media. In fact, both detectives testified that they did *not* search for social media "brag" posts by Mr. Williams before searching his phone, even after gaining his identity by way of the *Terry* stop described *infra*.

In one (and only one) robbery, the suspect who the Government now claims is Dadisi Williams was wearing a grey "Champions" branded hooded sweatshirt. The Government's witnesses conceded at the suppression hearing that this is a very common color and design of a sweatshirt, which they have seen many times being worn by other individuals. The final crime in this alleged string of completed and attempted robberies occurred on November 22, 2024.  On this date, the Lower Merion Police obtained a photograph of the vehicle used by the offenders to escape the area. The vehicle was identified, in a "Liaison Report" distributed to police officers, as a grey Mazda 3 hatchback without "a visible license plate." (Gov't. Ex. 2). That same report included a photograph of the front of the car, which, while somewhat grainy, does appear to show some fairly distinct front-end damage.

Later that same day, police officers, through diligent and appropriate investigatory measures, found a vehicle in Philadelphia which matched the description of the vehicle distributed in the aforementioned Liaison Report. Officers staked out the vehicle and observed Defendant Dadisi Williams leave a nearby home, approach the vehicle in question and access the trunk of the vehicle. Officers also observed that Defendant Williams was wearing a sweatshirt that matched the description of one of the robbers in one of the robberies. Officers approached Defendant Williams for a *Terry* stop based on that suspicion, and Defendant Williams

complied with their requests. The officers approached Defendant Williams, handcuffed him and placed him in the back of their patrol car without explanation.

Officer Nabbil Assad, one of the responding officers, testified at the suppression hearing that, despite being handcuffed behind his back, Defendant Williams managed to retrieve his cell phone from either his front-right pants pocket or from the front pocket of his hooded sweatshirt. Officer Assad then removed Defendant Williams's cell phone from his possession and seized it. Defendant Williams remained in handcuffs, in the back of the police car, for just shy of 45 minutes and was given little to no information as to what was occurring. Body-worn camera footage from the scene shows the responding officers consulting with Detectives Jara and Black (as well as another detective who was merely on duty, Detective Godfrey) who were not on the scene and that those detectives determined what the officers on the scene should do. Ultimately, the officers on the scene were instructed to seize Defendant Williams's car, cell phone, and sweatshirt, all without a warrant, and then let Defendant go.

The officers on the scene gave the cell phone to another patrol officer who responded separately, and that officer transported the cell phone to Philadelphia detectives for storage in a Faraday box with the FBI. Detective Jara was unsure how long it would have taken the police to secure the phone in a Faraday box but believed it would have taken two to three hours. No other testimony contradicted that suggested timeline. Officer Assad testified that he was unable to turn on "airplane mode" for the phone to block wireless communication, presumably leaving the phone

fully functioning for the several hours it spent outside the Faraday box. Shortly after the officer departed with the phone to bring the phone to a local police station, the officers let Defendant Williams out of the back of the vehicle and removed the handcuffs. Officers informed Defendant Williams that while he was free to go, they would be taking his car, sweatshirt, and cell phone. Defendant Williams immediately protested the seizure of his cell phone and inquired how that was permissible without a warrant. The officers on the scene assured him it was, and that they just get the warrants later. Defendant Williams also asked to remove tools from his vehicle. That request was refused.

Importantly, during this part of the interaction, the Court observed that the officers were in no way afraid for their safety or worried that Defendant might be able to remotely delete data from his phone. To the contrary, because the officers were seizing Defendant Williams's sweatshirt on a cold, rainy evening, the officers were kind enough to allow Defendant Williams to return into his home totally unsupervised and return dressed for the weather to get paperwork from the officers. While inside, Defendant Williams could have quickly used another device to delete the information on his phone before it was secured in a Faraday box, could have called others for help, or could even have returned with a weapon. The officers seemed to be not at all worried about any of those possibilities or have any fear for their own safety.

Both Detective Jara and Detective Black testified under oath that they felt that when the patrol officers stopped Defendant Williams on November 22, 2024 there was not yet enough evidence to establish probable cause to arrest him. At oral argument

the Government made several attempts to sidestep the question of probable cause by merely saying "the investigation was ongoing." In response to a direct question by the Court, the Government conceded that probable cause had not yet been met. After a conference at counsel table with an apparently senior attorney, the Government retracted that damaging concession and instead argued that probable cause was established but that the officers let Defendant Williams go to allow them to further investigate.

On November 25, 2024, detectives applied for a warrant to search Defendant Willaims's phone. (Gov't Ex. 6). The warrant ("the November 26 Philadelphia Warrant") was approved on November 26, 2024, and the phone was searched that day. The November 26 Philadelphia Warrant was stunning in its breadth. It essentially authorized the search of every conceivable app and file on the phone, with no express time limitations. Detective Jara, in his testimony, confirmed that the warrant included no limitations on the types of data he could access or a time limitation on the data he could search. The search of the phone uncovered significant amounts of inculpatory evidence which the Government seeks to use at trial. Importantly, the warrant application, which was approved the same morning it was presented to the Common Pleas Judge, includes no information which suggest the cell phones were used before, during, or after the commission of these crimes. Instead, the purported basis to search the phone is that Defendant Williams is suspected of these crimes, and that cell phones often include useful evidence.

On January 9, 2025, Detective Black obtained a warrant for the arrest of Defendant Williams. (Gov't Ex. 7). Detective Black testified that his affidavit of probable cause did not include any information specific to Defendant Williams in the descriptions of the offenses.   The evidence which supported the arrest warrant, therefore, was found in the sections entitled "Vehicle Located" and "Dadisi WILLIAMS' cell phone examination." (*Id.* at USA_000069-71). Under the "Vehicle Located" heading, the information connected to Defendant Williams is that he was scene accessing the trunk of the Mazda 3 recovered at the scene while in possession of the key to the car and later referred to it as "my car." (*Id.* at USA_000069). In addition, the affidavit of probable cause mentions that Defendant Williams was found wearing a grey "Champions" hooded sweatshirt that all witnesses agreed was very common. The balance of the information in the affidavit of probable cause is information obtained from the seizure and search of Defendant Williams's cell phone.

This Court held a suppression hearing on December 9, 2025. At the hearing, the Government's witnesses testified consistent with the factual recitation made *supra*. There was no testimony or evidence that suggested Defendant Williams consented to the seizure or search of his cell phone. Importantly, the Government witnesses did not testify that they had any concerns that Defendant Williams, specifically, was going to destroy the data on his phone. Similarly, when questioned about the basis for the November 26 Philadelphia Warrant, the Government's witnesses were unable to articulate any specific information they had about Defendant Williams's use of cell phones before, during, or after the crimes in question.

Instead, the answers were general, amounting to a general suggestion that people involved in crimes like this tend to use their phones, and that people who commit crimes together tend to communicate by phone.

### III.    Legal Standard

The Fourth Amendment protects the "right of people to be secure`in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Generally, police cannot search or seize individuals, or their property, without a warrant "supported by Oath or affirmation, and particularly describing the place to the searched, and the persons or things to be seized." *Id.* The Supreme Court has recognized several exceptions to the warrant requirement. For example, in *Terry v. Ohio*, the Court permitted brief detainment of individuals when police have reasonable suspicion that the individual has engaged in criminal activity. *Terry v. Ohio*, 392 U.S. 1, 30–31 (1968).

*Terry* has since been extended to personal property in *United States v. Place*, where the Court held "brief detentions of personal effects may be so minimally intrusive of the Fourth Amendment interests that strong countervailing governmental interests will justify a seizure based only on specific articulable facts that the property contains contraband or evidence of a crime." *United States v. Place*, 462 U.S. 696, 706 (1983).[4] Under the Fourth Amendment, a person suffers a seizure of property when there is "some meaningful interference with an individual's

---

[4]    In *Place*, the Supreme Court found that the warrantless seizure of a traveler's luggage for a 90-minute period until the officers could subject it to the sniff of a drug detecting dog and obtain a search warrant violated the Fourth Amendment and justified suppression of evidence.

possessory interests in that property.[5] *United States v. Jacobsen*, 466 U.S. 109, 113 (1984).

While *Place* permits "brief detentions of personal effects" based on reasonable suspicion alone, the authority to detain personal effects ends at the same time as the authority to detain the individual under *Terry*. *See Place*, 462 U.S. at 708 ("[W]e must reject the Government's suggestion that the point at which probable cause for seizure of luggage from the person's presence becomes necessary is more distant than the case of a *Terry* stop of the person himself."). When an extended seizure occurs, the Government needs to show more than reasonable suspicion.

The Supreme Court considered the constitutionality of extended seizures of personal effects pending application of a warrant in *Illinois v. McArthur*, where the Court found a warrantless seizure of a residence "reasonable" until a proper warrant could be obtained.[6] *Illinois v. McArthur*, 531 U.S. 326, 337 (2001). The Court in *McArthur* considered four circumstances to determine reasonableness: (1) the police had probable cause to believe the property being seized contained evidence of a crime; (2) the police had "good reason to fear" evidence would be destroyed before a warrant could be obtained; (3) "the police made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy"; and (4) the time period of

---

[5]    The parties do not dispute that Defendant Williams suffered a seizure of his cell phone on November 22, 2024.

[6]    In this case the police refused to permit Defendant from entering his trailer home unsupervised for two hours while the police obtained a search warrant. The Defendant was not otherwise restricted, and no search of the residence occurred until the warrant was obtained.

the seizure "was no longer than reasonably necessary for the police, acting with diligence, to obtain the warrant." *Id.* at 331–33.

To prove probable cause exists, the Government must show "a fair probability that contraband or evidence of a crime will be found in a *particular place*." *United States v. Alexander*, 54 F.4th 162, 171 (3d Cir. 2022) (emphasis added) (quoting *Illinois v. Gates*, 462 U.S. 213, 238 (1983)). While the Court in *Gates* stated that "probable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of rules," the Government must show a "substantial chance" that evidence of crime exists and will be found in the places or things to be seized and searched. *See id. at* 243.

Next, to prove exigent circumstances—in this case destruction of evidence— the Third Circuit requires "objective indicia" that evidence would be destroyed— known by police at the time of seizure. *See United States v. Velasquez*, 626 F.2d 314, 317 (3d Cir. 1980) ("[defendants] urge that there were no objective indicia that the contraband was about to be destroyed . . . . We are constrained to agree.[7]"). Similar to a finding of probable cause, the Government must articulate why destruction of evidence is likely in this specific case. *See, e.g.*, *United States v. Babcock*, 924 F.3d 1180, 1194 (11th Cir. 2019) (finding exigent circumstances existed when the defendant tried to deceive officers and the defendant knew the police were interested

---

[7]    In *Velazquez* the Defendants were suspected of selling controlled substances. The Government's argument that exigent circumstances justified a warrantless search was rejected when there was no showing that contraband in the house was about to be destroyed, that defendants were about to escape, or that law enforcement was in any danger,

in *searching* his phone); *United States v. Ramsey*, No. CR 19-268, 2020 WL 2220312, at *1, *5 (E.D. Pa. May 6, 2020) (Pratter, J.). (finding exigent circumstances existed when the defendant "knew at the time that he revoked consent that the Government wanted *to search* the laptop for evidence.").

While the Government undoubtedly has an interest in pursuing valid law enforcement investigations, this Court must weigh that interest against the individual's privacy interests. *McArthur*, 531 U.S. at 332. In *McArthur* the Court found reasonable efforts were made to reconcile the two as "[police] neither searched the trailer nor arrested McArthur before obtaining a warrant. Rather, they imposed a significantly less restrictive restraint, preventing McArthur only from entering the trailer unaccompanied. They left his home and his belongings intact—until a neutral Magistrate . . . issued a warrant." *Id.* It is not enough that a search had not occurred until a warrant was obtained, rather, *McArthur* is also concerned with the "restraint" placed on a defendant to access the seized property.

An individual's phone must be afforded heightened protections as it "is the digital equivalent of its owner's home, capable of holding a universe of private information. *United States v. Mitchell*, 565 F.3d 1347, 1352 (11th Cir. 2009) (citation omitted); *See also United States v. Laist*, 702 F.3d 608, 614 (11th Cir. 2012) ("[C]omputers are a unique possession, one in which individuals may have a particularly powerful possessory interest."). The Supreme Court has recognized this interest in *Riley v. California*, observing "[m]odern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold

for many Americans 'the privacies of life.'" *Riley v. California*, 573 U.S. 373, 403 (2014) (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)).

Regarding diligence, as the Eleventh Circuit has held, "[w]hen police diligently pursue their investigation, a reviewing court can have confidence that the governmental interest is legitimate and the intrusion occasioned by the challenged detention was no greater than reasonably necessary." *Babcock*, 924 F.3d at 1189) (citing *United States v. Burgard*, 675 F.3d 1029, 1033 (7th Cir. 2012)). To determine diligence, this Court looks at not only the length of the seizure, but also the methods employed to obtain the warrant. Diligence in this context "includes not only seeking a warrant application promptly, but also communicating with the suspects concerning the specifics of the detention." *Id.* In *Place*, for example, the Supreme Court "faulted officers for failing to inform the suspect where and for how long they were taking his bags, and when and how he could get them back." *Id.* (citing *Place*, 462 U.S. at 710).

## IV.   Analysis

The seizure of Defendant William's phone violated his Fourth Amendment rights, as there was no warrant and no exception to the warrant requirement applies. Even if the Government could justify a temporary seizure of the phone to obtain a warrant, seizing the phone for several days prior to obtaining a warrant is unreasonable and further violates William's constitutional rights. Even if *arguendo* the seizure and delayed warrant were not a constitutional violation, the warrant lacked probable cause and was too broad in its scope. This Court finds that the seizure

and search of Defendant Williams's phone was a serious Constitutional violation which requires the suppression of all evidence found as a result of the Government's initial search of Defendant Williams's cell phone, and all fruit of that poisonous tree

### A. The Government's seizure of Defendant Williams's cell phone was unconstitutional.

#### 1. The Government seized Defendant Williams's cell phone without a warrant, which is presumptively improper.

This Court will first address a threshold question: whether the Philadelphia Police Department violated the Constitution when it took Defendant Williams's cell phone without a warrant and held it for four days before obtaining one. As an initial matter, there can be no doubt that a seizure occurred for Constitutional purposes. When the police took Defendant Williams's cell phone without his consent, they created a "meaningful interference" with his "possessory interest in that property." *Jacobsen*, 469 U.S. at 113. It is further beyond dispute that a warrant was not obtained prior to seizing the phone. Rather, the police took it from Defendant Williams's person without his consent during their *Terry* stop of him and did not return it to him when they released him from their temporary custody.

As described above, the Fourth Amendment to the United States Constitution generally prohibits the seizure of property without the issuance of a warrant. U.S. Const. amend. IV; *see also Place*, 462 U.S. at 701 ("In the ordinary case, the Court has viewed a seizure of personal property as *per se* unreasonable within the meaning of the Fourth Amendment unless it is accomplished pursuant to a judicial warrant issued upon probable cause and particularly describing the items to be seized."). The

Supreme Court has specifically upheld that requirement as it applies to cell phones. *See Riley*, 573 U.S. at 403.

As the Supreme Court's decision in *Place* makes clear, certain warrantless seizures of personal property without an exception to the warrant requirement are appropriate. But those seizures are typically analogous to a *Terry* stop: brief detentions based on articulable facts which are limited in scope to fulfill a specific investigatory purpose. That means that when the police took and held Defendant Williams's cell phone without a warrant after the *Terry* stop concluded, that seizure was subject to the presumption described in *Place* that it was *per se* unreasonable.[8] This Court must next examine whether an exigency exception to the warrant requirement was present or whether this seizure passes muster as the sort of temporary seizure approved of in *Place* and *McArthur*.

### 2. The Government has not met its burden to show there was a destruction of evidence exigency or any other exigency.

One common exception to the general rule that the Government must obtain a warrant before seizing personal property is the presence of an exigency.[9] The Government, in its briefing, although interestingly not in its presentation of evidence

---

[8]    To be clear, this Court sees nothing at all wrong with the officers briefly holding onto Mr. Williams's phone during their appropriate *Terry* stop. *See Place*, 462 U.S. at 715 (Brennan, J., concurring) ("It is true that *Terry* stops may involve seizures of personal effects incidental to the seizure of the person involved. Obviously, an officer cannot seize a person without also seizing the personal effects that the person has in his possession at the time."). The issues in this case arise from the government's maintaining possession of the cell phone without a warrant after the conclusion of the *Terry* stop.

[9]    Another exception which the officers on the scene may have briefly considered is search incident to arrest. This exception to the warrant requirement permits officers to search for and seize evidence on the person of an arrestee. *Chimel v. California*, 395 U.S. 752, 763 (1969). The detectives in this case testified that they did not have probable cause to arrest Mr. Williams that evening, and in any event did not do so, so there is no search incident to arrest argument to be made here.

at the Motion to Suppress, argues that warrantless seizure of the phone was appropriate based upon the destruction of evidence exigency. The Supreme Court has repeatedly recognized that police officers can seize evidence warrantlessly where there is reason to believe the suspect will destroy it before the Government can obtain a warrant for it.

This Court is guided by the Third Circuit's decision in *United States v. Rubin*, in which the panel rejected an argument that this exigency is only met "when the searching officers have knowledge that evidence is actually being removed or destroyed." 474 F.2d 262, 266 (3d Cir. 1973). Instead, the panel recognized, the exigency can be triggered by facts which support a belief by the officers that there is a "threatened" destruction of evidence. *Id.* at 267 (citing *Vale v. Louisiana*, 399 U.S. 30, 34 (1970). The key showing is whether "based on the surrounding circumstances or the information at hand, they reasonably conclude that the evidence will be destroyed or removed before they can secure a search warrant." *Id.* at 268.

The Third Circuit listed five factors which are frequently considered in making such an assessment: "(1) the degree of urgency involved and the amount of time necessary to obtain a warrant . . . (2) reasonable belief that the contraband is about to be removed . . . (3) the possibility of danger to police officers guarding the site of the contraband while a search warrant is sought . . . (4) information indicating the possessors of the contraband are aware that the police are on their trail . . . and (5) the ready destructibility of the contraband and the knowledge that efforts to dispose

of [evidence] and to escape are characteristic behavior of persons engaged in the [crime suspected]." *Id.* at 268-69 (internal citation omitted).

Here, these factors counsel strongly against the warrantless seizure of Defendant Williams's cell phone. As to the first prong, the Government has shown little to no urgency involved in the situation, and has made no showing that obtaining a warrant quickly while holding the property in a *Place* stop was not possible. To the contrary, Detective Jara testified that there are Common Pleas judges available where the circumstances are "exigent." The seizure here *far* exceeded the amount of time needed to get a warrant for the phone. In all likelihood, the officers could have urgently obtained a warrant during the duration of their *Terry* stop. But even if it may have taken slightly longer than that, there is simply no rational explanation as to why the officers waited three days, until the "next business day," to even apply for a warrant. (Dkt. #73 at 18). Neither the Constitution nor the warrant-issuing authorities of the Courts of Philadelphia take the weekends off. The Government presented no cases to the contrary.[10]

As to the third consideration,[11] there is no evidence presented to the Court that there was any danger to officers at the scene which would prevent them from staying

---

[10]    The Government tried to argue that the three-day delay in applying for a warrant was "reasonable" as Detective Jara was off duty. This argument fails for many reasons. There were other Philadelphia detectives working on this investigation who could have applied for the warrant. Detective Godfrey was on duty at the time of the *Terry* stop. He was working in consultation with Detectives Jara and Black and had the ability and availability to immediately apply for a warrant. Detective Black was likewise available in the next county (a few miles away) and capable of obtaining a warrant. Nothing about waiting three-days to apply for a warrant shows reasonableness under the circumstances of seizing a cell phone.

[11]    This Court leaves the second consideration for last, as it is worthy of the greatest discussion.

there with the phone until a warrant was obtained. As to the fourth consideration, it is obviously true that Defendant Williams was then aware that the police were on his trail, even if they did not explain why he was being detained or why his property was being seized, and so that factor cuts in favor of the Government. As to the fifth consideration, this Court finds that this factor comes out to be a draw. While electronic data is often easily destroyed, it is not always so. Digital activity often leaves recoverable footprints,[12] and not everyone has the technical skills to cover those tracks. Further, no evidence has been presented to this Court that robbers or attempted robbers by and large tend to delete data when under investigation.

This Court has left the second consideration for last, as it finds it to be the most critical to this case. Importantly, the Third Circuit has recognized that the Government must show "objective indicia" that evidence would be destroyed, known by police at the time of seizure. *See Velasquez*, 626 F.2d at 317 ("[defendants] urge that there were no objective indicia that the contraband was about to be destroyed . . .. We are constrained to agree."). Here, the Government's proffered explanation of an exigency based upon destruction of evidence is paper thin and highly generalized. There was no evidence that Williams attempted to wipe his phone before the officers seized it. He made no comments to police or to family that he intended to wipe it. There were no furtive conversations with a spouse like in *McArthur*.[13]

---

[12]    *See, e.g.*, Gov't Ex. 12 at USA_000229, ¶ 27 ("Even when a user deletes information from a device, it can sometimes be recovered with forensic tools.").

[13]    The Government argued in their its Opposition brief that the Defendant was reaching for his phone, thus creating a concern for destruction of evidence. This argument was not repeated during oral argument presumably because it was thwarted by the evidence presented. Officer Assad testified that Defendant Williams was reaching for his cell phone while handcuffed with his hands behind his

The Government's generalized assertion of exigency amounts to: once a criminal suspect knows we are onto them, we can immediately seize their phone without a warrant if we think there may be evidence on it. This proposed "generalized exigency" principle is illustrated here, where the Court has found no actual evidence a phone was used in commission of the crimes. This argument is further fortified by the testimony of Detective Jara, who admitted it was he who gave the order *via* phone call to the patrol officers on scene to seize the phone. Detective Jara testified that the reason for seizing the phone was to get evidence of the crimes.  He knew absolutely nothing about Defendant Williams at the time he gave the order. Because he was not on the scene when Defendant Williams was detained, he similarly was poorly situated to use his "training and experience" to make an individualized assessment that Defendant William's conduct on scene created a likelihood he would try to destroy evidence, and no information was relayed to Detective Jara by officers on the scene to support this conclusion either. Given those facts, any argument of exigency must therefore be an entirely generalized one, with no consideration at all given to Defendant Williams, himself.

The limitlessness of this principle grows exponentially when taken to its logical conclusion. This Court cannot imagine a crime from murder all the way down to jaywalking, for which a cell phone might not contain *some* iota of relevant evidence. After all, proving an offender is in the location where the crime was committed at the

---

back. For anyone who has ever used a smartphone, it is nonsensical to think that any but the most skilled user of such devices could destroy incriminating evidence from such a devise without being able to review it.

time you alleged the crime was committed is an essential part of any criminal prosecution, big or small. Although the officer suspecting you of jaywalking may think he can prove the case and justify arrest based on his own witness testimony, why wouldn't he, if the Government is correct, just take the suspect's phone to be sure? The Government, implicit in their generalized argument, are essentially requesting a blanket rule that once you know the Government is investigating you, they get your phone without a warrant. That cannot be the law. When asked for a limiting principle at oral argument, the Government failed to provide one.

Also present in this discussion is the fact that Defendant Williams was not arrested that day. So, the rule requested by the Government here is not *merely* that they get the phone of people they have probable cause to arrest. Rather, the Government is seeking a rule that they get to seize and keep the phone of virtually *anyone* they *suspect* committed a crime, once that person becomes aware of the suspicion.[14]

The Government's argument regarding exigency is belied by their actual actions in the case. The Government, after seizing the phone, took *three days* to even apply for the November 26 Philadelphia Warrant. Detective Jara testified that, where there is an exigency, a Common Pleas Judge can be made available on the weekend. If there was truly an exigency to get that phone and find out what is on it before it could get deleted, that exigency would presumably be manifested by the officers'

---

[14]    As this articulation of the government's position makes clear, the rule the government seeks would be incredibly easy to exploit. If the government was unable to get probable cause on someone, all they would have to do is perform a *Terry* stop on them and seize their phone, justified by an exigency they intentionally created to exploit. That cannot be consistent with the Fourth Amendment.

course of conduct in obtaining the November 26 Philadelphia Warrant and imaging and searching the phone. The lackadaisical efforts made by law enforcement suggest no such exigency was present.

The Government's exigency argument is particularly poorly received in light of the specific evidence seized: a cell phone. As the Supreme Court recognized in *Riley*, cell phones are just different. *Riley,* 573 U.S at 396 (recognizing unique privacy interest in data on cell phones); *see also Carpenter v. United States,* 585 U.S. 296, 306, (2018) (recognizing that the immensity of digital data "does not fit nearly under existing precedents."). The sheer quantity of data they can contain (*see supra*) render them particularly sensitive items to seize. Their ubiquity in society also makes their absence a particularly harsh deprivation of property. These factors combine to make them a particularly sensitive subject of seizure and search—worthy of the heightened protection the Supreme Court has given them.[15]

This Court finds there was no destruction of evidence exigency present in this case. As the Government has not made argument or introduced evidence of any other

---

[15]    It should also not be lost that the logical conclusion of the Government's proposed rule would easily extend into the home and other locations not on the person of the suspect. The classic example of a destruction of evidence exigency is the flushing of drugs down the toilet. In such cases, Courts have repeatedly approved knocking down doors to homes to prevent the destruction of the drugs. The Government has not offered any principled reason why its rule would not have permitted the Government to knock down Mr. Williams's front door to get his cell phone if he had not been holding it on his person. The threat of destruction would be the same either way, and the exigency equally present. That cannot be the rule. Although the government has not argued that this is so, neither has the government offered a logical limiting principle that would stop their request for a general exigency of cell phone destruction from leading to invasions of the home, as the drug destruction exigency cases universally permit.

exigency, this Court finds no exigency which would create an exception to the warrant requirement is present in this case.[16]

### 3. The seizure of Defendant Williams's cell phone fails under the standards announced in *Place* and *McArthur*.

Having no warrant justifying seizure of the phone and having no exigency, the inquiry in this case could end here, as the cell phone in question was unreasonably seized without any legal justification. As the remedy of exclusion is significant, the Court will next address the Government's additional arguments.

This Court can easily disregard argument that taking Defendant Williams's phone was a *Place* seizure. Rather than a brief *Terry*-style seizure of property to expeditiously fulfill an investigatory purpose, this was a full deprivation of property which extended for several days before a warrant was obtained. Further, a key fact in *Place* was that the officers in question were communicative about the nature of and expected duration of the stop in question. *Place*, 462 U.S. at 710. This case looks nothing like *Place*. The video evidence in this case showed that officers steadfastly refused to answer Defendant Williams's questions.

The Government's primary position at oral argument was that the seizure of the cell phone was proper under *McArthur*. This Court is aware of what might be seen as a gap in the precedent when interpreting *McArthur*. The *McArthur* decision is not *explicitly* treated as an exigency case. Rather, Justice Breyer seems to have balanced

---

[16] The Government's premise seems to be that the police are reasonable in assuming that every single suspect they encounter is likely to destroy evidence if given the chance. But destruction of evidence is its own crime codified in various parts of the United States Code, which would carry its own penalties, even if the Government cannot make out its case on underlying offense for which they were investigated. *See, e.g.*: 18 U.S.C. § 1519.

the facts and circumstances to determine whether the search was *reasonable*. This Court will accordingly independently consider the factors Justice Breyer did and conduct a balancing test to find whether the seizure may have otherwise been reasonable. Upon comparing *McArthur* and its facts to the facts at bar, this Court easily finds that the *McArthur* factors weigh strongly against the legality of the Government's warrantless seizure and retention of Defendant Williams's cell phone.

In *McArthur,* the Supreme Court considered whether a reasonable seizure occurred when police officers refused to allow the defendant to enter his residence until a police officer returned with a search warrant. *McArthur*, 531 U.S. at 328–29. The majority opinion set forth four factors present in the case which justified the temporary seizure of the home, which this Court finds instructive. The first is whether there was probable cause to believe the property seized contained evidence of a crime. *Id.* at 331-32. Here, as will be explained more fulsomely below in the section addressing the validity of the November 26 Philadelphia Warrant, this Court finds that probable cause was lacking.

The second factor given consideration in *McArthur* is the officers' "good reason to fear" that without seizing the evidence, it would have been destroyed. *Id.* at 332. The *McArthur* decision supports this finding by way of citation to specific actions by the defendant in that case and his wife. *Id.* As was explained above in the Court's finding there was no destruction of evidence exigency present, there is no specific evidence tailored to Defendant Williams that he had any intention to destroy his cell phone data.

24

The third *McArthur* factor is that the officers "made reasonable efforts to reconcile their law enforcement needs with the demands of personal privacy." *Id.* Specifically, rather than arresting McArthur or searching the trailer home in question before getting a warrant, the officers merely restricted him from entering unsupervised. *Id.* Here, this factor comes out even. On one hand, the actual *search* of the cell phone did wait until a warrant was obtained (though this Court finds *infra* that this warrant was invalid). But the seizure did amount to a total deprivation of his property, as there was no analogous "supervision" that could have occurred.

Finally, Justice Breyer approved of the seizure in *McArthur* because "the police imposed the restraint for a limited period of time, namely, two hours." *Id.* Here, the facts could hardly be more different. This Court would doubtlessly have approved of the police sitting with the phone for two hours to ensure it was not the subject of tampering until the November 26 Philadelphia Warrant was issued. But instead, the officers took the phone and deprived Defendant Williams of it for *four days* until obtaining a warrant. This factor weighs strongly against the Government.

Even taking the less rigid exigency approach modeled in *McArthur*, this Court has little difficulty determining that the Government's seizure of Defendant Williams's cell phone violated the Fourth Amendment. Based on little more than a hunch, and without any explanation, the Government took and kept Mr. Williams's phone warrantlessly for four days and can point to no objective facts that he was likely to destroy the evidence on the phone. Balancing the facts and circumstances,

this Court finds the Government's warrantless seizure of Defendant Williams's phone to be unreasonable.

### 4. The cases cited by the Government are unpersuasive and distinguishable.

In its response in opposition to Williams's motion, the Government asserted that exigent circumstances, namely the potential for Willaims to destroy evidence contained on his cell phone prior to its seizure, obviated the need for a warrant in this instance. However, as mentioned *supra*, the Government presented no evidence of exigency at the motion to suppress hearing and made little or no mention of exigent circumstances during oral argument. That said, the cases it cites in its brief for its position on exigent circumstances are all distinguishable from the present matter.

The Government cites several cases for the proposition that the instant warrantless seizure comports with our Constitutional protections. (Dkt. #73 at 16). First up is the 11ᵗʰ Circuit's decision in *United States v. Babcock*, 924 F.3d 1180 (11th Cir. 2019). There, officers, investigating a domestic disturbance confiscated the suspect's phone for two days before eventually obtaining a search warrant. *Id.* at 1184. When officers arrived on scene, the suspect initially lied and told them that he was home alone. Shortly thereafter, a scantily clad teenage girl emerged from the trailer with blood on her thigh. *Id.* at 1185. In an effort to explain, the suspect handed an officer his phone to show the officer a video of the girl apparently threatening to harm herself. *Id.* In the video, the suspect could be heard berating the girl. Eventually, the officers discovered sexual videos of the suspect and the girl which precipitated charges against the suspect.

Ultimately, the Court concluded that seizure to prevent deletion of evidence was proper as the officers had both probable cause to believe the phone contained evidence of a crime *and* an exigency existed. The panel observed that the suspect had initially tried to deceive the responding officers by denying that anyone else was in his camper and claiming that he did not know she was underage. *Id.* at 1194. Notably, and distinguishable from the present case, the suspect had voluntarily turned over his phone and showed officers video of the girl potentially harming herself. At that point, the officer's had an interest in preserving that media to illuminate any evidence of the circumstances surrounding the domestic disturbance call. *Id.* at 1193.

Nothing here, aside from the warrantless seizure, resembles the scenario in *Babcock*. Williams did not voluntarily turn over his phone or show any of its contents to the detaining officers. In fact, the phone was locked which prevented Officers Asaad from switching it to airplane mode to prevent remote deletion. Critically, the officers had no specific indication (as they did in *Babcock*) that the phone contained any evidence of a crime.[17]

In *United States v. Burton*, the 4th Circuit similarly concluded that the warrantless seizure of two cell phones was justified under the exigent circumstances exception to the warrant requirement. 756 F. App'x 295, 299 (4th Cir. 2018). There,

---

[17]     Notably, the 11th Circuit remarked that a cell phone, in and of itself, does not create an exigent circumstance. "Taken to its logical conclusion," that "would permit police officers to seize now-ubiquitous cell phones from any person … so long as the phone contains [media] that could serve as evidence of a crime simply because the nature of the device used …might result in it being lost." *Babcock*, 924 F.3d at 1194.

based on the information communicated during an initial voluntary interview between the suspect and investigators, the suspect would have been "aware that he was the subject of an *investigation into the use of cell phones to take up-skirt photos*[.]" *Id.* at 299. Similarly, in *United States v. Ramsey*, officers had specific information from both the defendant and a confidential informant that defendant had been communicating with another target of the investigation and that evidence of crimes would be found on the laptop that the officers had seized. *Ramsey*, 2020 WL 2220312, at *1, *5.

In *United States v. Henry*, the 1st Circuit held that the defendant's phone in a human sex-trafficking case was subject to warrantless seizure under the plain view doctrine. 827 F.3d 16 (1st Cir. 2016). Dismissing the defendant's assertion that officers did not have probable cause to believe that the phones seized had immediately apparent evidentiary value, the Court observed that officers observed defendant's nervousness when he was specifically asked about his phones. *Id.* at 28. Additionally, defendant specifically stated that he used the phones to take photographs, which the officers believed to be significant in the context of a sex-trafficking instigation. *Id.*

Finally, in *United States v. Bradley*, police had, prior to the seizure of defendant's laptop, informed the defendant of the substance of the investigation, namely, child pornography. 488 F. App'x 99, 103 (6th Cir. 2012). During the investigation, officers determined that a specific IP address was associated with suspected child pornography. *Id.* at 101. The 6th Circuit observed that it was

objectively reasonable to seize defendant's laptop rather than leave it unguarded in the hands of a suspect who knows it will be searched.  *Id.* at 103.

All of these cases are distinguishable from the present matter.  In each, either the specific nature of the crime is inextricably related to the technology that was seized without a warrant (in the case of child pornography), or officers had specific information, usually from the defendant, that the item to be seized would contain evidence of the crime.  Neither of those circumstances are present here.

### B. The November 26 Philadelphia Warrant lacked probable cause.

Defendant Williams raises a third argument in support of suppressing the evidence found on his phone.[18] He argues that the November 26 Philadelphia Warrant was based on a lack of probable cause because there was no evidence in the affidavit that either perpetrator of the crimes in question used their phone before, during, or after these crimes. The Government responds by arguing that the detective who applied for the warrant explained that, in his experience, evidence of crimes is commonly located by searching cell phones, including photographs, text messages, and location data, among other things. Further, the Government contends the detective established probable cause because there were at least two suspects, which leads to an inference that they are in contact with each other *via* phones between the robberies.

---

[18]    Defendant firstly argued that the seizure of his cell phone was unconstitutional as it lacked probable cause, it was warrantless and there were no exigent circumstances that justified seizure. Secondly the Defendant Williams argued that there was an unreasonable delay (four days) between the seizure of the phone and obtaining the warrant which was also a Constitutional violation.

The Fourth Amendment requires that warrants only be issued based upon probable cause. U.S. Const. amend. IV. A judge may find probable cause when, viewing the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates,* 462 U.S. at 238. A Court reviewing a warrant's validity should examine the facts before the magistrate judge at the time and determine whether there was a substantial basis for finding probable cause to issue the warrant. *United States v. Jones*, 994 F.2d 1051, 1054 (3d Cir. 1993).

Importantly, while probable cause that evidence will be found does not require "hard certainties," it "does require more than a 'hunch'."" *United States v. Lauria*, 70 F.4th 106, 128 (2d Cir. 2023) (finding no probable cause in warrant for cell cite location data where challenged affidavits only averred that the cell phone's owner was Facebook friends with his co-defendant and that his phone was in contact with his co-defendant's cell phone number shortly before one of the robberies.). "[P]olice may not rely on the general ubiquitous presence of cellular telephones in daily life, or an inference that friends or associates most often communicate by cellular telephone, as a substitute for particularized information that a specific device contains evidence of a crime." *Commonwealth v. Morin*, 85 N.E.3d 949, 960 (Mass. 2017). *See also: United States v. Garcia*, No. 3:20-CR-00058 (KAD), 2023 WL 4850553, at *8 (D. Conn. July 28, 2023) ("Indeed, to issue a warrant on the basis of evidence suggesting minimal amounts of coordination between co-conspirators would be to license virtually automatic searches of the cell phones of any persons suspected of engaging

in criminal conspiracies.") (quoting *United States v. Gomez*, 652 F. Supp. 461, 463 (E.D.N.Y. 1987)).

On the Court's inspection of the application for the November 26 Philadelphia Warrant, there are no allegations that a cell phone was used in the commission of the actual offenses or observed at any of the crime scenes. Rather, the warrant application seems to essentially boil down to "evidence of crimes is usually found on a cell phone." By implication, therefore, the Government here once again asks this Court to apply an unprincipled and boundless rule that whenever any crime is committed, the police can get a warrant to search the suspect's phone.

This Court cannot countenance the generalized argument that criminals tend to use phones and that therefore if you suspect someone of a crime, you get unfettered access to their phone. That same logic would apply with equal force to a jaywalker. The Government's jaywalking case would doubtlessly be improved by GPS evidence showing that the jaywalker carried their phone and was in the location the Government alleges they jaywalked. But no reasonable person could possibly think that this flimsy justification could support the search and seizure of the entirety of the contents of the perpetrator's cell phone.

That justification is the same one before the Court in the Government's opposition. The Government needed *something* more to implicate the use of the cell phone. There is no evidence besides the detective's *ipse dixit* "training and experience" which would create probable cause the phone contained evidence of the crime in question. This Court need not blanketly endorse invasive searches of electronic data

on the basis of mere hunches rooted in specious and unspecified training and experience. *See Lauria*, 70 F.4th at 128.

The assumptions made in the November 26 Philadelphia Warrant application are not nearly as reasonable as they appear on the surface. A smart robber may well leave their cell phone at home or turn off location data during the robbery. Perhaps the suspect may have more than one phone, one of which is used exclusively for non-criminal purposes. Perhaps the two suspects live near each other and communicate in person. Absent specific factual assertions about this case's relationship to the cell phone in question, this Court cannot see how probable cause existed to search Defendant Williams's phone.

As Chief Justice Roberts noted, "[m]odern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans "the privacies of life[.]" *Riley*, 573 U.S. at 403 (quoting *Boyd v. United States*, 116 U.S. 616, 630 (1886)). A warrant, like the one at issue, which opens up essentially the entirety of a suspect's private life to government inspection, is even more invasive than a search of the home. *See Id.* at 396-97 ("Indeed, a cell phone search would typically expose to the Government far more than the most exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it also contains a broad array of private information never found in a home in any form—unless the phone is."). Phones are now "such a pervasive and insistent part of daily life that the proverbial visitor from Mars might

conclude they were an important feature of human anatomy." *Id.* at 385. In that respect, cell phones are just different.

The Government has argued that rejecting the warrant here would amount to a finding that unless a cell phone was clearly visible during the crime, the Government could never get a warrant to search it. This argument falls apart under even the lightest scrutiny. This Court is not requiring a cell phone to be visible (though that would likely be sufficient). A suspect wearing wireless headphones speaking with someone else would likely be enough to get a warrant of reasonable scope. So, too, a cell phone shaped bulge in a perpetrator's pocket. Certain crimes which naturally involve the use of electronic devices (such as insider trading or wire fraud) might more easily justify warrants for such devices as well.

To be even more clear, there was an easy path forward for the police in this case, specifically. The officers found Mr. Williams's cell phone number during their search of the car. Officers likely could have gotten a limited "tower dump" warrant for the cell phone towers servicing the areas near the carjackings during the relevant time periods. Cross checking those records would doubtlessly have led the officers to determine that Mr. Williams's phone was present at the scene of various of these crimes. Combined with the information obtained during the *Terry* stop and search of Mr. Williams's car, that surely would have been enough information to obtain a warrant for GPS data directly off Mr. Williams's phone to show that it was, indeed, at the scene. From there, a broader warrant for other evidence from Mr. Williams's

phone would likely have been supported by probable cause.[19] The fact that the Government would have to get several "piggyback warrants" is a feature of the Constitution which is to be embraced, not an inconvenience to police that should be circumvented.

### C. The November 26 Philadelphia Warrant was overly broad as it failed to state with particularity what could be seized and provided a limitless search.

This Court also takes great umbrage with the scope of the November 26 Philadelphia Warrant. The application sought—and the magistrate granted—virtually boundless access to the phone. (*See generally:* Gov't Ex. 6). The warrant grants the Government access to, *inter alia*, *every* email, *every* text message, *every* digital file, *all* call logs, *all* location data, and *all* internet browsing history. As must by now be an obvious common theme in this opinion, this warrant includes no limiting principle. Detective Jara testified that his understanding was that the warrant permitted him to search the entirety of the phone's contents.

The November 26 Philadelphia Warrant, therefore, permitted the Government to examine all of Defendant Williams's text messages for evidence, including messages from many years ago. It permitted the Government to look at photos from long ago, see who he spoke to years ago, inspect his resting heart rate *via* a health app, and know everywhere he has visited since he has had this phone.[20] There is no

---

[19]    Though, as the Court will explain next, such a warrant could still not be as broad as the one obtained in this case.

[20]    The Court is being generous to the Government in its description of this data reaching back only as far as he has owned this phone. Modern phones enable users to roll data forward from one

conceivable way that there was a reasonable likelihood that evidence of the crime in question here would be found in text messages from months and years before the robbery, or from the data in his health app, or from photographs sent to him by family members. In that way, the warrant sought the digital equivalent of the right to search in a jewelry box for a shotgun.[21]

One of the primary reasons a particularized warrant is required before most searches is our free society's aversion to a "'general warrant' abhorred by the colonists, and the problem is not that of intrusion per se, but of a general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). That is why courts require a warrant to include a particular description of the things which are to be seized. *Id.* "[A] warrant may be so facially deficient—i.e., in failing to particularize the place to be searched or the things to be seized—that the executing officers cannot reasonably presume it to be valid." *Groh v. Ramirez,* 540 U.S. 551, 565 (2004) (quoting *United States v. Leon*, 468 U.S. 897, 923 (1984). The search executed after the issuance of such a warrant should only search in places in which evidence could actually be found. *Cf. United States v. Dyer,* 54 F.4th 155, 160

---

device to another. In all likelihood, the November 26 Philadelphia Warrant granted access to data from well before he owned this phone.

[21]    The Court is not at all naïve to the motivations of law enforcement in seeking and obtain such a warrant. In their zest to solve crime and arrest a dangerous criminal, rather than developing probable cause, it is far easier to search a person's phone to connect or exonerate them.  This Court will not permit an end run of the constitution for expediency. Additionally, if permitted to search the entirety of the phone purportedly in search of evidence of *one* crime, an officer may well "just happen to find evidence of another crime in plain view." For that reason, a warrant for an electronic device needs to be carefully tailored to exclude that possibility to the greatest extent possible.

(3d Cir. 2022) (noting that search of a box was proper because officers could reasonably infer the item to be seized was small enough to fit in the box).

This Court finds that the warrant, along with lacking probable cause, badly missed the mark with respect to the particularity requirement of the Fourth Amendment and is a "general warrant," the fear of which inspired the Fourth Amendment in the first instance.[22] The officers should only have been permitted to search information within a reasonable time frame related to the robberies and attempted robberies in question. The warrant, therefore, is invalid on its face.

### D. The evidence found as a result of the November 26, 2024 search of Defendant Williams's phone must be suppressed, and all fruit of the poisonous tree must be as well.

Having now found the seizure and search of Defendant Williams's phone unlawful three times over,[23] this Court must address the proper remedy. Defendant Williams asks this Court to suppress the evidence and the fruit of the poisonous tree. The Government urges that even if his rights were violated, either or both the good faith exception and the inevitable discovery doctrine counsels against exclusion. This Court finds the Government's response unavailing and therefore will suppress the evidence found on the phone and all evidence which flowed directly from it.

---

[22]    In this way, the November 26 Philadelphia Warrant is quite distinguishable from the search warrant obtained by the Montgomery County District Attorney's Office and the later warrant to search Mr. Nichols's phone. The November 26 Philadelphia Warrant included no limiting principle in what could be searched *and* no limiting principle on what timeframes were searchable. Those two limitless qualities combine to create an impermissible general warrant. The tailoring in the other phone-related warrants is significantly better in at least one of those categories, which could lead to a different result.

[23]    That is: the seizure was improper, the search warrant lacked probable cause, and the search warrant was not sufficiently particularized.

1. **This Court must exclude the evidence found as a result of the November 26 Philadelphia Warrant, as well as any fruit of the poisonous tree, because the balance of justice favors exclusion, and the good faith exception does not apply.**

The exclusionary rule serves to exclude illegally obtained evidence when doing so serves "to safeguard Fourth Amendment rights . . . through its deterrent effect." *United States v. Calandra,* 414 U.S. 338, 348 (1974). Exclusion of evidence, however, is not an automatic remedy. *Id.* at 348. Rather, evidence should only be excluded where the police conduct at issue is "sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." *Herring v. United States*, 555 U.S. 135, 144 (2009). Indeed, exclusion is applied when the conduct at issue is "deliberate, reckless, or grossly negligent, or when it will deter recurring or systemic negligence." *United States v. Tracey*, 597 F.3d 140, 151 (3d Cir. 2010).

The good faith exception to the exclusionary rule permits the introduction of illegally obtained evidence in the very many cases which do not meet the high standard set out by the exclusionary rule. The Third Circuit has identified four primary situations where evidence searched pursuant to a warrant is not saved by the good faith exception, two of which are relevant here. The good faith exception fails to apply where either "the warrant was based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or "the warrant was so facially deficient that it failed to particularize the place to be searched or the things to be seized." *United States v. Zimmerman,* 277 F.3d 426, 436–37 (3d Cir. 2002*) (quoting United States v. Hodge,* 246 F.3d 301, 308 (3d Cir.2001)).

These exceptions typify the sort of conduct which is "deliberate, reckless or grossly negligent" and therefore the benefit of exclusion outweighs the societal costs. *Tracey*, 597 F.3d at 151.

As this Court has already observed, the application for the warrant lacked probable cause on its face. The application was a totally generalized boilerplate series of loose connections between Defendant Williams and his phone. For that reason, no reasonable officer could have believed that probable cause was present. Further, the information sought could hardly have been *less* particularized. This Court, striking the careful balance between the need to protect the Fourth Amendment as well as the right of the people to have their case presented with all the evidence that has been obtained, determines that exclusion is necessary. This Court fears that if it does not exclude evidence, virtually every suspect may someday be subjected to this sort of limitless and unprincipled warrant, based solely on hunches. The need for this protection has only grown in the years since *Riley* and *Carpenter* were decided. Such police misconduct must be deterred now, before it gets out of hand. This Court does not believe that any law enforcement officer could look at that warrant in good faith and find it appropriate.

Further, applying the high-level principles announced by the Supreme Court to the testimony of Detective Jara, there can be no doubt that he was "deliberate" in seeking a warrant that was totally limitless in the scope of data to be obtained. *See id*. at 151. Both his testimony and the argument of the Government made clear that this sort of warrant is a "recurring" problem that also requires remedy. *See id.* For

these reasons, the evidence found in the November 26 Philadelphia Warrant must be excluded.

Along with the evidence obtained directly from the improper search of Defendant Williams's cell phone, the fruit of the poisonous tree doctrine "require[es] courts to suppress evidence as the tainted 'fruit' of the unlawful government conduct and apply the exclusionary rule "not only to the illegally obtained evidence itself, but also to other incriminating evidence derived from the primary evidence." *Nix v. Williams*, 467 U.S. 431, 441 (1984). The key question is "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Id. at 442* (cleaned up).

This Court finds that at least some evidence the Government has obtained against Defendant Williams is plausibly fruit of the poisonous tree. As will be explained more, *infra*, this Court will schedule subsequent argument to address the effects of this decision on the admissibility of other evidence.

### 2. The Government has not met its burden of proving any evidence which will be excluded by this decision would inevitably have been found in subsequent lawful searches.

The Government, in a short footnote in its brief, gestures somewhat weakly at the inevitable discovery doctrine. More specifically, the Government purportedly "reserves" an inevitable discovery argument regarding the warrant. (Dkt. #73 at 21, n. 13). This Court is not entirely sure as to the legal effect of a bare claim to reservation. This Court is unaware of any rule of Criminal Procedure which permits

a party, in response to a motion, to fail to brief any law on a key issue with the intention of bringing it up later. This attempt to "reserve" an argument is unfair to the Defendant Williams, who had little to no idea what the Government would argue and therefore could not prepare appropriate evidence of his own or legal arguments and analogous case citations. This attempted reservation is also thoroughly unhelpful to the Court, which lacks the sort of adversarial briefing which benefits the ends of justice. Along with being unhelpful, there is a very good argument that this weak gesture failed to preserve the argument at all. *See United States v. Byrd,* No. CR 23-209-1, 2025 WL 2553736, at *5 (E.D. Pa. Sept. 4, 2025) (Weilheimer, J.) (noting argument was "underdeveloped to the point of waiver."); *see also* Fed. R. Crim. P. 12(e) (providing "a party waives any [motion to suppress] defense, objection, or request not raised by the deadline" set by the district court). The Court does not know for *when* the Government was "reserving" this argument. The time to raise it was now. And the Government has failed to do so with any specificity in either the evidence that was presented or the argument that was made at the motion to suppress hearing.

Addressing the argument, head on, this Court finds it without merit. The inevitable discovery doctrine shields from exclusion evidence obtained illegally "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means" because "the deterrence rationale has so little basis that the evidence should be received.*"Nix*, 467 U.S. at 444. The Government argues that the unchallenged warrant for Defendant

Williams's vehicle would have yielded his phone number by way of business cards from in the car, which would have led to a warrant being issued. But, as this Court has explained extensively above, there was no probable cause to search his phone in the first place, as there was no evidence of the crime's use in commission of the crime, and this Court cannot accept the boilerplate rationale for the warrant the Government requests. The fact that his number was on a business card would not have changed that calculus, and therefore, the Government cannot show by a preponderance of an evidence that they could have worked up enough evidence to implicate the search of his phone.[24]  Finally, even if an appropriate warrant *could* have been obtained for the phone at a later date, that still does not justify the initial unlawful seizure, which would justify exclusion on its own.

> E. **This Court reserves judgment on whether there was probable cause to arrest Dadisi Williams and will schedule further argument on whether Dadisi William's arrest warrant was fatally flawed, what evidence is excluded as fruit of the poisonous tree, and whether the Government would have enough evidence to prove its case if the arrest warrant is valid.**

This Court reserves judgment as to which, if any, other warrants in this case constitute fruit of the poisonous tree, as the focus in the hearing was largely (and appropriately) focused on the merits of the suppression claims. The Court strongly suspects that the Arrest Warrant of Mr. Williams fails, because when the suppressed evidence is struck from that warrant, all that remains is that Mr. Williams was found

---

[24]    It is also ironic that the Government argues strenuously first that the phone could be exigently seized because Defendant Williams was likely to wipe it, but now claim that they inevitably would have been able to obtain the phone and all its contents. Which is it?

in possession of a vehicle which matched the photograph of one used at one robbery while wearing a very common sweatshirt which was used at one robbery. Both testifying detectives (and the Assistant United States Attorney before being overruled by her supervisor) conceded at the hearing that this amount of evidence was insufficient probable cause to justify arresting Mr. Williams the night of the *Terry* stop, which would make it also insufficient to independently support an arrest warrant months later.[25] This Court independently assess the facts and agrees that those facts, while certainly enough to create reasonable suspicion, likely did not create probable cause to arrest Mr. Williams. This Court will reserve final judgment on that issue until it has been fully argued by the Parties.

## V.   Conclusion

It is the responsibility of the judiciary to ensure that we live up to the promise of the Fourth Amendment and hold law enforcement to task when they seize or search the personal property of the people of the United States. The police failed in this regard. The Motion is Granted, and the evidence from the phone and its poisonous fruit is suppressed.

DATED December 15, 2025                    BY THE COURT:


                                           _____

                                           GAIL WEILHEIMER          J.

---

[25]    While this Court is not bound to accept the concessions of these officers, the Government's entire justification of the seizure and search is that the Court should rely on the experience and training of the detectives in question. This Court cannot endorse a bait-and-switch from the Government which would suggest this Court should not trust those officers' judgment now.